**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

Carlos Alvarado,

      Plaintiff

v.

Hunt, et al.,

      Defendants

Case No.: 2:24-cv-01159-JAD-MDC

**Order Granting Defendants' Motion for Summary Judgment on Federal Claim, Dismissing State-law Claim without Prejudice to its Refiling in State Court, and Closing Case**

[ECF No. 38]

This case stems from Las Vegas Metropolitan Police Department (Metro) officers' decision to arrest Uber driver Carlos Alvarado for driving under the influence after he tried to drive through a busy Las Vegas Strip crosswalk. Post-arrest tests for substances vindicated Alvarado's insistence that he wasn't impaired, and he sues the arresting officers, claiming that the arrest violated his state and federal constitutional rights because they lacked probable cause.

The defendant officers now move for summary judgment, arguing that the totality of what they observed gave them probable cause to arrest Alvarado and, at minimum, ensures them qualified immunity from his federal claim. I find that it was reasonably arguable that probable cause existed to arrest Alvarado, so the officers are entitled to qualified immunity on his federal claim. And because that ruling disposes of the only claim over which this court has original jurisdiction, I decline to exercise supplemental jurisdiction over the remaining state-law claim. So I grant the defendants' motion for summary judgment on the federal claim, dismiss the state-law claim without prejudice to its refiling in state court, and close this case.

**Background**

**A.      A commotion near a busy crosswalk draws Officers Hunt and Montalbano's attention to Alvarado.**

Late one night on the famed Las Vegas Strip, Hunt, Montalbano, and several other officers were responding to a fight when Alvarado, who was driving for Uber, pulled a white SUV into a nearby private driveway to drop off passengers.[1]  Nothing about that arrival initially drew the officers' attention.  A few minutes later, Alvarado tried to leave the driveway and turn onto the street.[2]  But that driveway opened into a crosswalk that was busy with foot traffic, so a crossing guard was stationed there to hold vehicles while pedestrians cleared the entrance.[3]  When Alvarado approached, the guard began yelling, "Hey, what are you doing!" as pedestrians were still crossing.[4]  The officers' body-worn-camera footage captured the beginning of that confrontation and shows Alvarado backing up while the guard stood near the front of the SUV.[5]  But it does not clearly capture the next few seconds.  One officer's camera turns away,[6] and the other tilts more toward the ground.[7]

Hunt and Montalbano testified that, after backing up, Alvarado maneuvered left to get around the crossing guard and toward the opposite lane of travel.[8]  Alvarado described the

---

[1] ECF No. 38-1 (BWC 468-4) at T06:03:26Z.  For clarity, I cite the body-worn-camera footage using the file labels from the defendants' manual filing.

[2] *Id.* at T06:05:09Z.

[3] *Id.*

[4] *Id.* at T06:05:12Z.

[5] *Id.* at T06:05:25Z.

[6] *See* ECF No. 38-1 (BWC 468-4) at T06:05:28Z.

[7] *See id*. (BWC 468-3) at T06:05:28Z.

[8] ECF No. 45-3 at 4; ECF No. 45-4 at 7–8.

encounter differently in his testimony, recounting that he backed up to create safety between him and the crossing guard, but he wasn't sure why he began moving his car forward afterwards.[9] But in the camera footage, he can be heard telling the officers that he was "trying to get around" the crossing guard and that he was an Uber driver trying to get back to work.[10]

**B.    Hunt and Montalbano detain Alvarado and begin investigating possible impairment.**

The bodycam footage shows Hunt and Montalbano ordering Alvarado out of the SUV and placing him in handcuffs.[11]  Shortly afterward, Montalbano spoke briefly with the crossing guard, who accused Alvarado of trying to "run over everybody" and said that he stepped in front of the SUV to stop Alvarado from doing so.[12]

The officers' attention then shifted to whether Alvarado might be impaired because an officer noted that he was leaning on his car with red eyes,[13] and the officers smelled marijuana—though the impaired-driving report only chronicles the presence of dilated and constricted pupils, not bloodshot eyes.[14]  Hunt stated that there was a "strong odor" and asked Alvarado whether he had "smoke[d] anything."[15]  In his deposition, however, Hunt also acknowledged that when he smells marijuana on the Strip, he is not always able to tell where it's coming from.[16]

---

[9] ECF No. 47-2 at 3 (Alvarado's deposition).

[10] ECF No. 38-1 (BWC 468-3) at T06:05:41Z–44Z, T:06:05:56Z–06:00Z.

[11] *Id.* at T06:05:34Z.

[12] *Id.* at T06:06:58Z–:07:10Z.

[13] ECF No. 38-1 (BWC 467-19) at T:06:08:17Z–20Z.

[14] ECF No. 38-8 at 6.

[15] ECF No. 38-1 (BWC 467-19) at T:06:08:14Z–31Z.

[16] ECF No. 45-3 at 10.

For his part, Montalbano testified that when he and Hunt first got to the driver's door, they could smell "burnt marijuana in the vehicle."[17]  He also testified that the smell "lingered for a bit and then dissipated," and that he looked around the vehicle to see whether anything visible was causing it.[18]  He did not believe Alvarado was actively smoking, and no marijuana or paraphernalia was found in the vehicle.[19]  The same record also reflects that Alvarado denied drinking or smoking that day and told Hunt that the last time he had smoked weed was in high school.[20]

The officers also described Alvarado as behaving unusually during his detention. Montalbano testified that Alvarado appeared "erratic," "very animated," "excited," and not "rational for what was going on for the situation."[21]  An officer can be heard on the bodycam remarking that there was "something off" about Alvarado, and another officer commented that Alvarado "can't sit still."[22]  Those observations led Hunt and Montalbano to request a DUI-unit officer.  While waiting for that officer's arrival, Hunt and Montalbano continued speaking with Alvarado and later removed his handcuffs.  The bodycam footage shows Alvarado performing balancing and heel-to-toe movements on his own.[23]  As he did so, he said "look," asked, "are we good?" and later remarked, "you guys think I'm pretty—why do you want to mess with me?"[24]

---

[17] ECF No. 38-3 at 8.

[18] ECF No. 38-3 at 22.

[19] *Id.*

[20] *Id.* at 27.

[21] *Id.* at 8.

[22] ECF No. 38-1 (BWC 467-18) at T06:14:03Z–:25Z.

[23] *Id.* (BWC 467-15) at T06:23:12Z–:40Z.

[24] *Id.*

**C.      Garcia arrives and conducts a DUI investigation; Alvarado gets arrested.**

Officer Garcia was working in the DUI unit that night when Hunt and Montalbano called him to conduct testing.  Hunt and Montalbano briefed him on why they had detained Alvarado before Garcia began his own investigation.[25]  One officer can be heard on the bodycam recording telling Garcia that "he's got something," but he just didn't know what it was.[26]  Garcia testified that he could smell marijuana coming from Alvarado.[27]  Garcia then conducted a roadside DUI investigation.  He administered the horizontal-gaze-nystagmus (HGN), walk-and-turn, one-leg-stand, and lack-of-convergence tests; Montalbano administered the finger-to-nose test; and Hunt administered a modified Romberg test, which tests the driver for swaying or balance issues.[28] The officers arrested Alvarado for a DUI following those tests and obtained a warrant to conduct a blood draw.[29]

**D.      Alvarado sues Montalbano, Hunt, and Garcia.**

Later testing from Metro and from a test Alvarado obtained himself came back negative for the tested substances.[30]  Alvarado filed this counseled action.  He asserts two claims against Officers Hunt, Montalbano, and Garcia: (1) a § 1983 civil-rights claim for unlawful-seizure in violation of the Fourth Amendment to the United States Constitution and (2) unlawful seizure in

---

[25] *Id.* (BWC 467-18) at T06:41:25Z–:43:03Z.

[26] *Id.* at T06:42:02Z.

[27] ECF No. 38-4 at 58, 71.

[28] ECF No. 44 at 4–5.

[29] ECF No. 38-9.

[30] ECF No. 38 at 13; ECF No. 38-13 (report of examination).

violation of Article 1, Section 18 of the Nevada Constitution.[31]  The defendant officers now move for summary judgment on both claims.[32]  Because I find that the officers are entitled to summary judgment on the federal claim based on qualified immunity, I decline to exercise supplemental jurisdiction over Alvarado's remaining state-law claim, leaving it for Alvarado to litigate in state court.

## Discussion

Summary judgment is appropriate when the pleadings and admissible evidence "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[33]  If the moving party does not bear the burden of proof on the dispositive issue at trial, it is not required to produce evidence to negate the opponent's claim—its burden is merely to point out the evidence showing the absence of a genuine material factual issue.[34]  The movant need only defeat one element of a claim to garner summary judgment on it because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."[35]  The court must view all facts and draw all inferences in the light most favorable to the nonmoving party.[36]

---

[31] ECF No. 23 (first amended complaint).  While Alvarado also sued Metro itself under a *Monell* theory, *see id.* at 7, he voluntarily dismissed that claim.  *See* ECF No. 31 (stipulation and order dismissing Metro).

[32] ECF No. 38.

[33] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)).

[34] *Id.* at 323.

[35] *Id.* at 322.

[36] *Kaiser Cement Corp. v. Fischbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

**A.      Qualified immunity shields officers from federal unlawful-arrest claims if it was reasonably arguable that there was probable cause.**

The defendants contend that they are entitled to qualified immunity on Alvarado's Fourth Amendment claim for unlawful seizure.  The doctrine of qualified immunity protects government officials "from money damages unless a plaintiff pleads facts showing that (1) the official violated a statutory or constitutional right, and (2) the right was 'clearly established' at the time of the challenged conduct."[37]  "In the context of an unlawful arrest, then, the two prongs of the qualified immunity analysis can be summarized as: (1) whether there was probable cause for the arrest; and (2) whether it is *reasonably arguable* that there was probable cause for arrest—that is, whether reasonable officers could disagree as to the legality of the arrest such that the arresting officer is entitled to qualified immunity."[38]  Probable cause to arrest exists when, "under the totality of circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the arrestee] had committed a crime."[39]

When a defendant raises this affirmative defense, the plaintiff bears the burden of demonstrating that both prongs are met.  Although the evidence must be considered in the light most favorable to the plaintiff,[40]  the plaintiff's version of events should not be adopted if there is video evidence that "tells quite a different story."[41]  The plaintiff's failure to establish either

[37] *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

[38] *Est. of Silva by & through Allen v. Murrow*, 2025 WL 1218454, at *2 (9th Cir. Apr. 28, 2025).

[39] *United States v. Smith*, 790 F.2d 789, 792 (9th Cir. 1986).

[40] *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 946 (9th Cir. 2017); *Tolan v. Cotton,* 572 U.S. 650, 657 (2014).

[41] *See Scott v. Harris*, 550 U.S. 372, 379–81 (2007).

prong compels summary judgment in favor of the defendant on qualified-immunity grounds.  Courts "have discretion to choose which qualified-immunity prong to address first" and, depending on the conclusion reached for the first-analyzed prong, "need not address the other."[42]

**B.      The defendants are entitled to summary judgment on Alvarado's federal unlawful-arrest claim based on qualified immunity because it was reasonably arguable that probable cause existed.**

For a right to be clearly established under the second prong, it must be "sufficiently clear that every reasonable official would understand that what he is doing violates that right."[43]  The "rule must be settled law, which means it is dictated by controlling authority or a robust consensus of cases of persuasive authority."[44]  And the right may not be characterized "at a high level of generality."[45]  Instead, "[t]he dispositive question is whether the violative nature of particular conduct is clearly established."[46]  The takeaway from the Supreme Court's recent qualified-immunity jurisprudence is that a court's analysis of the clearly-established-law prong "must be undertaken in light of the specific context of the case, not as a broad general proposition."[47]

The parties frame that inquiry through the Ninth Circuit's decision in *Ramirez v. City of Buena Park*.[48]  In *Ramirez*, an officer detained a driver asleep behind the wheel of a parked car

---

[42] *Isayeva*, 872 F.3d at 946 (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

[43] *Smith v. Agdeppa*, 81 F.4th 994, 1001 (9th Cir. 2023) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11–12 (2015)).

[44] *Id.*

[45] *Mullenix*, 577 U.S. at 12 (quoting *al-Kidd*, 563 U.S. at 742).

[46] *Id.*

[47] *Id.*

[48] *Ramirez v. City of Buena Park*, 560 F.3d 1012 (9th Cir. 2009)

outside a drugstore at night.[49]  The officer had drug-recognition training and, before the arrest, observed what he understood to be several classic indicators of stimulant use: apparent uncontrollable sleepiness, irritability, rapid breathing, an elevated pulse, and distorted time perception on a Romberg test.[50]  The driver offered innocent explanations for that behavior: he had worked 75–80 hours that week and was resting because he was tired, and he aced the finger-to-nose test.[51]  The Ninth Circuit acknowledged those competing indicators and recognized that facts tending to dissipate probable cause remain relevant to the analysis.[52]  But it held that the suspect's innocent explanations did not eliminate the suspicious facts from the probable-cause calculus.[53]  So bypassing the constitutional question, the panel held that a reasonable officer could have believed probable cause existed to arrest the driver for being under the influence and that the officer was therefore entitled to qualified immunity.[54]

The Ninth Circuit later cited *Ramirez* in *Rosenbaum v. Washoe County* for the proposition that while it is "well established" that an arrest without probable cause violates the Fourth Amendment, an officer who makes an arrest without probable cause "may still be entitled to qualified immunity if he reasonably believed there to have been probable cause."[55]  The panel ultimately didn't find qualified immunity to apply in *Rosenbaum*, however.  Rosenbaum was arrested for scalping free promotional State Fair tickets.[56]  The Ninth Circuit held that the arrest

---

[49] *Id.* at 1016.

[50] *Id.* at 1018, 1023–24.

[51] *Id.* at 1018–19.

[52] *Id.* at 1023–24.

[53] *Id.*

[54] *Id.*

[55] *Rosenbaum v. Washoe County*, 663 F.3d 1071, 1076 (9th Cir. 2011).

[56] *Id.* at 1074.

9

violated the Fourth Amendment because no Nevada statute criminalized that conduct.[57]  Because there was no Nevada scalping law and no other crime was a fit for Rosenbaum's conduct, the Ninth Circuit concluded that "all reasonably competent officers would have agreed that he was not committing a crime."[58]  So the panel held that qualified immunity did not shield the officer from suit.[59]

The Ninth Circuit applied that framework in *Estate of Silva by and through Allen v. Murrow* to reach the opposite conclusion.[60]  In *Silva*, officers responded to a psychiatric-emergency call involving a man whose behavior could have been attributed to either schizophrenia or drug impairment.[61]  Some facts pointed away from intoxication: the caller repeatedly told dispatch that Silva was schizophrenic, off his medication, and not under the influence of drugs or alcohol.[62]  But others could reasonably be construed to support intoxication, including an officer's report of "recent use," an elevated pulse, and a failed 30-second Romberg test.[63]  The panel held that, even assuming the officers lacked actual probable cause, qualified immunity still applied because the situation presented mixed indicators and no clearly established law required officers to make the correct judgment in the face of that uncertainty.[64]

---

[57] *Id.* at 1073–74.

[58] *Id.* at 1078–79.

[59] *Id.* at 1079.

[60] *Est. of Silva*, 2025 WL 1218454 at *2.  I recognize that *Estate of Silva* was decided after the events in this case.  But that only reinforces the point: if the Ninth Circuit had not clearly established the rule by 2025, then it was not clearly established in 2023.

[61] *Id.* at *1.

[62] *Id.*

[63] *Id.*

[64] *Id.* at *2.

The defendant officers cast this case as an even stronger candidate for immunity than *Ramirez*.[65]  They were drawn to a driver who had just been involved in a heated confrontation with a crossing guard at a busy crosswalk, and by the time Officer Garcia arrived, the picture had grown more concerning: there was a marijuana odor, and Alvarado had watery or bloodshot eyes and was fidgety.  The defendants also do not limit their probable-cause theory to DUI.  In their view, the crosswalk episode alone could support other crimes, including reckless driving and assault, because it gave the officers reason to think Alvarado had driven in a way that threatened the crossing guard or nearby pedestrians.[66]  So if qualified immunity applied in *Ramirez* despite the driver's perfect performance on one field test and his benign explanation for sleeping in the car, they argue that it applies here too.

Alvarado contends that *Ramirez* is not dispositive because Garcia's investigation was not merely debatable but unreliable.[67]  He highlights that his expert, Julian Scott, avers that standardized field-sobriety tests are "not driver-impairment tests," have not been scientifically validated to provide statistical probabilities that a person is using any drug other than alcohol, and alone cannot establish that a person is incapable of safely driving or exercising actual physical control of a vehicle.[68]  Scott also states that the officers administered their tests incorrectly and that Garcia's instructions, demonstrations, and scoring methods were flawed enough to undermine the validity of the test results.[69]

---

[65] ECF No. 38 at 32–33.

[66] *Id.* at 16; *United States v. Magallon-Lopez*, 817 F.3d 671, 675 (9th Cir. 2016) ("If the facts support probable cause for one offense," an arrest may be lawful "even if the officer invoked, as the basis for the arrest, a different offense.").

[67] ECF No. 44 at ¶¶ 10–11.

[68] ECF No. 45-8 at ¶¶ 5–9.

[69] *Id.* at ¶¶ 10–29.

11

Garcia's conclusions did not fit any coherent theory of intoxication, Alvarado adds. He emphasizes that Hunt and Montalbano seemed to think he might be under the influence of some stimulant rather than alcohol or marijuana. But, according to Scott, the signs Garcia reported do not line up with stimulant impairment or, for that matter, any other major category of intoxicant.[70] Scott opines that Alvarado did not present as impaired by any of the seven major drug categories and notes the absence of many common indicators associated with those substances.[71] He also argues that the body-worn-camera footage does not clearly show the fidgeting, inability to stay still, or other suspicious behavior that the defendants emphasize. In Alvarado's view, then, Garcia's investigation did not produce mixed evidence—it produced unreliable evidence that cannot bear the weight that the defendants place on it.

Alvarado has also identified real weaknesses in the officers' account: the body-worn-camera footage does not clearly show the critical seconds after he backed up; the odor evidence was inconsistent; the footage does not clearly confirm every behavior the officers later described as suspicious; and Garcia's roadside testing may have been flawed. Those points matter, but they do not turn this into a *Rosenbaum*-type case in which the facts and the law points only one way. They make this a mixed-record case, and under *Ramirez* and *Estate of Silva*, a mixed record is not enough to show that every reasonable officer would have understood the arrest to be unlawful.

The crosswalk encounter itself gave the officers a concrete reason to escalate the stop. They were drawn to Alvarado because of a heated confrontation with a crossing guard at an active late-night pedestrian crossing on the Strip. While the footage confirms that Alvarado

---

[70] ECF No. 44 at 8–10, 15–16; ECF No. 45-8 at ¶¶ 30–33.

[71] ECF No. 45-8 at ¶¶ 30–33.

stopped before entering the crosswalk, it is undisputable that this encounter caused the crossing guard to yell at Alvarado, recount to Montalbano that Alvarado was going to "run over everybody," and explain that he stepped in front of Alvarado's SUV to stop him from doing so. And although the video does not clearly show the seconds after Alvarado backed up, it does capture him admitting to the officers that he was "trying to get around" the crossing guard.

That is where this case parts company with *Rosenbaum*. In *Rosenbaum*, no Nevada statute fit the conduct the officer confronted. Here, by contrast, the facts on scene could at least arguably support one or more crimes, including reckless driving, impaired driving, or both. That conclusion may be debatable, but it is not so implausible that every reasonable officer would have had to reject it.

The later impairment indicators also cut both ways. The marijuana-odor evidence was inconsistent, but it was not absent. Hunt said on bodycam that there was a "strong odor," then later acknowledged that he could not always tell where marijuana odor was coming from on the Strip. Montalbano testified that he smelled burnt marijuana in the vehicle, but also said the odor dissipated and that he did not think Alvarado was actively smoking. And Garcia smelled marijuana on Alvarado when he approached him.

The same is true of Alvarado's behavior while detained. Alvarado is correct that the bodycam footage does not clearly show every behavior the officers later described as suspicious. But it also does not clearly refute those impressions. Instead, it shows conduct that could reasonably be interpreted in different ways. The officers described Alvarado as behaving in a way they thought was unusual—"something off," "can't stay still," "really fidgety and antsy,"

"erratic," and "very animated."[72]  The bodycam footage shows Alvarado continuing to move, talk, balance, and perform parts of the testing sequence on his own while the officers waited for Garcia.  Alvarado argues that the officers misread that behavior through a confirmation-bias lens and treated anything unusual as evidence of impairment rather than making a standardized, reliable assessment of the full circumstances.[73]  But even accepting that, this is still not a record on which every reasonable officer would have had to view the behavior as innocuous.  It remains part of the mixed set of facts that officers on scene could reasonably read in different ways.

That is why Alvarado's attack on Garcia's testing does not do the second-prong work he needs it to do.  I accept that his criticisms, if credited, would permit a jury to discount some or even much of Garcia's roadside investigation.  The tests may have been poorly administered, some reported clues may have been overstated, and the later toxicology evidence may show that the officers got it wrong.  But even crediting those points, the officers still had more than the challenged tests.  Before Garcia arrived, they had already witnessed the crosswalk confrontation, heard the crossing guard's accusation, smelled some version of marijuana odor, and described Alvarado as unusually restless and animated.  Garcia then arrived, was briefed on those observations, and conducted the roadside investigation against that backdrop.

So even taking the evidence in the light most favorable to Alvarado, I cannot conclude that the facts so plainly failed to establish probable cause that every reasonable officer would have recognized Alvarado's arrest as unlawful.  Even assuming without deciding that the arrest violated the Fourth Amendment, the officers are entitled to qualified immunity from Alvarado's federal civil-rights claim.

---

[72] ECF No. 38-2 at 66; ECF No. 38-3 at 8, 22; ECF No. 38-1 (BWC 467-18) at T06:14:03Z–:25Z.

[73] ECF No. 44 at 25.

**C.      The court declines to exercise supplemental jurisdiction over Alvarado's remaining state-law claim.**

The resolution of Alvarado's federal civil-rights claims leaves only his state-law claim for violating Nevada's constitution.  Because this lawsuit was filed in federal court based on federal-question jurisdiction, this court is exercising supplemental jurisdiction over this state-law claim.[74]  But once a plaintiff's federal claims are gone, the court may decline to exercise supplemental jurisdiction over the remaining state-law claims.[75]  Because I grant summary judgment in favor of the defendants on Alvarado's federal claim, I decline to continue to exercise supplemental jurisdiction over Alvarado's remaining state-law claim.  So I dismiss it without prejudice to his ability to refile it in state court under 28 U.S.C. § 1367.

**Conclusion**

IT IS THEREFORE ORDERED that the defendants' motion for summary judgment **[ECF No. 38] is GRANTED**.  With good cause appearing and no reason to delay, **the Clerk of Court is directed to ENTER PARTIAL FINAL JUDGMENT in favor of defendants Bradley Hunt, Antonio Montalbano, and Isaiah Garcia and against Plaintiff Carlos Alvarado on his First Cause of Action (Unlawful Seizure in Violation of the Fourth Amendment (§ 1983)) only, based on qualified immunity.**

Because the disposition of this federal claim leaves no remaining claims over which this court has original jurisdiction, I decline to exercise supplemental jurisdiction over Alvarado's remaining Nevada Constitution claim.  IT IS THEREFORE ORDERED that the **remaining**

---

[74] 28 U.S.C. § 1367(a).

[75] 28 U.S.C. § 1367(c)(4); *see Harrell v. 20th Century Ins. Co*., 934 F.2d 203, 205 (9th Cir. 1991) ("[I]t is generally preferable for a district court to remand remaining pendent claims to state court.").

15

**state-law claim is DISMISSED without prejudice to its refiling in state court under 28 U.S.C. § 1367(c)**, and the Clerk of Court is directed to **CLOSE THIS CASE.**

_____
U.S. District Judge Jennifer A. Dorsey
March 30, 2026